IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BASKIN-ROBBINS FRANCHISING LLC, a Delaware Limited Liability Company,<br><br>and<br><br>BR IP HOLDER LLC, a Delaware Limited Liability Company,<br><br>          Plaintiffs,<br>v.<br><br>BLU MOO ICE CREAM INC., an Indiana Corporation;<br><br>and<br><br>ROBERT HOLOCHER, an Individual,<br><br>          Defendants. | Case No. 1:24-cv-293 |

**DECLARATION OF DEREK ENSMINGER IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

I, Derek Ensminger, hereby declare as follows:

1. I am over 18 years of age and competent to make this Declaration, which I submit in support of Plaintiffs Baskin-Robbins Franchising LLC ("Baskin-Robbins") and BR IP Holder LLC's ("BR IP Holder") (Baskin-Robbins and BR IP Holder, collectively, the "Baskin-Robbins Entities") Motion for Preliminary Injunction.

2. I am Senior Director – Senior Litigation Counsel for Inspire Brands, Inc. ("Inspire Brands"). Inspire Brands is the indirect parent company of both Baskin-Robbins and BR IP Holder.

141947v4

3. I make certain statements in this Declaration based on my personal knowledge. To the extent I do not have personal knowledge of a particular fact, I make such statements to the best of my knowledge, information, and belief based on: (i) my review of corporate records generated and stored in the ordinary course of the Baskin-Robbins Entities' business; (ii) communications to me from other employees of the Baskin-Robbins Entities whose duties include providing me with information about the Baskin-Robbins' Entities' business that is truthful and accurate to the best of their knowledge, information, and belief; and/or (iii) photographs that were taken and provided to me at my instruction. I would testify to all of the statements herein if called upon to do so.

*The Baskin-Robbins Franchise System*

4. Baskin-Robbins is the franchisor of the Baskin-Robbins franchise system, and, in that capacity, enters into franchise agreements with independent franchisees, granting each franchisee the right to operate an independent ice-cream shop that makes use of Baskin-Robbins' valuable trademarks, intellectual property, and goodwill.

5. BR IP Holder is the owner of the intellectual property that comprises the Baskin-Robbins brand, including what the Baskin Robbins franchise agreement defines as Baskin-Robbins' "Proprietary Marks," compromised of the "trademarks, service marks, logos, emblems, trade dress, trade names, including Baskin-Robbins® and other indicia of origin," and Baskin-Robbins has the right to use, to license others to use, and to enforce the Proprietary Marks. (*See* Exhibit A, described in greater detail below, at ¶ 2.1).

6. A number of the Proprietary Marks are federally registered trademarks, and most of them are incontestable under federal law.

7.  The Baskin-Robbins name has been used continuously and extensively in commerce since approximately 1954, and has become synonymous with a worldwide network of retail ice-cream shops, as well as the high-quality ice-cream and related products sold in them.

8.  Because of the extensive investment that Baskin-Robbins has made in the promotion and sale of items associated with the Proprietary Marks, including the franchising of Baskin-Robbins ice-cream shops, the Proprietary Marks have become widely known and recognizable—and Baskin-Robbins is one of the largest and most well-recognized brands of retail ice-cream shops in the world.

*The Blu Moo Franchise Agreement*

9.  Defendant Blu Moo Ice Cream Inc. (the "Franchisee") entered into a Franchise Agreement (the "Franchise Agreement") with Baskin-Robbins on or about December 22, 2017, for the ownership and operation of a Baskin-Robbins franchise at 1280 US Highway 31 N, Greenwood, Indiana, 46142 (the "Restaurant").[1] A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A.

10. Defendant Robert Holocher signed an addendum to the Franchise Agreement personally guaranteeing the Franchisee's payment and performance obligations under the Franchise Agreement. (Ex. A at Personal Guarantee).

11. The Franchise Agreement was to remain in effect until February 28, 2036, unless sooner terminated by its terms. (Ex. A at 1).

---

[1] A second franchise agreement between Blu Moo Ice Cream, Inc. and Baskin-Robbins is at issue in the lawsuit, identified in the Complaint as the "Indianapolis Franchise Agreement" and the restaurant operated pursuant to it as the "Indianapolis Restaurant." The Franchisee has committed many of the same violations described here with respect to the Indianapolis Franchise Agreement and Restaurant—and the Complaint seeks money damages accordingly—but, due to what Plaintiffs understand to have been the efforts of the Franchisee's landlord at the Indianapolis Restaurant, an injunction to require the Franchisee to cease operations there and have it de-identified is not needed, and therefore it is not addressed further in this Declaration.

12. The Franchise Agreement afforded the Franchisee the right to operate an independent ice-cream shop, making use of the Proprietary Marks and goodwill associated with the Baskin-Robbins brand, in exchange for, among other things, the payment of various fees, including a Continuing Franchise Fee of 5.9% of Gross Sales, as defined in the Franchise Agreement, and a Continuing Advertising Fee of 5% of Gross Sales. (*See* Ex. A at 1).

13. The Franchise Agreement stipulated that the Franchisee would be permitted to "use and display [the] Proprietary Marks only in connection with the operation of the Restaurant," and made clear that the Franchisee had "no rights in the Proprietary Marks or [Baskin-Robbins'] System other than those explicitly granted" in the Franchise Agreement. (Ex. A at ¶¶ 9.0, 9.3).

14. The Franchise Agreement set forth the circumstances under which the Franchisee could be found in default of the Agreement, and among those was the failure to pay money owed to Baskin-Robbins or the Advertising Fund when due. Baskin-Robbins was authorized to terminate the Agreement if such monetary defaults remained uncured for a period of seven days. (Ex. A at ¶ 14.1.2).

15. Termination of the Franchise Agreement triggered a number of obligations on the part of the Franchisee and Holocher, including:

- Paying all sums due to Baskin-Robbins, including applicable fees and interest, within ten (10) days.

- Ceasing all operations at each Restaurant immediately, and no longer holding themselves out as Baskin-Robbins franchisees.

- Ceasing all use of the Proprietary Marks, removing from the Restaurant all indicia of the Marks, and taking all steps that Baskin-Robbins may require in order to de-identify the Restaurant and to distinguish it from other restaurants operating within the Baskin-Robbins system.

(Ex. A at ¶¶ 14.7.1-14.7.3).

16. The Franchisee Agreement also contains a post-termination restriction on competition with Baskin-Robbins, would take effect upon termination of the Franchise Agreement, and precludes the Franchisee from, among other things, operating a competing ice-cream shop within five miles of the Restaurant for a period of twenty-four months after termination:

> For the first twenty-four months following the expiration or termination of this Agreement or transfer of an interest in the franchised business (the "Post-Term Period"), neither you nor any shareholder, member, partner, officer, director or guarantor of yours, or any person or entity who is in active concert or participation with you or who has a direct or indirect beneficial interest in the franchised business, may have any direct or indirect interest in, perform any activities for, provide any assistance to or receive any financial or other benefit from any business or venture (other than an ownership in real property) that sells products that are the same as or substantially similar to those sold in Baskin-Robbins restaurants and located within five (5) miles from the Restaurant or any other Baskin-Robbins restaurant that is open or under development. The restriction in the previous sentence does not apply to your ownership of less than two percent (2%) of a company whose shares are listed and traded on a national or regional securities exchange. The Post-Term Period begins to run upon your compliance with all of your obligations in this Section.

(Ex. A at ¶ 10.2).

17. The Franchisee stipulated in the Franchise Agreement that breach of the post-term restrictive covenant would "be deemed to threaten immediate and substantial irreparable injury" to Baskin-Robbins and would give Baskin-Robbins "the right to obtain immediate injunctive relief without limiting any other rights" that Baskin-Robbins might have. (Ex. A at ¶ 10.4).

*Default and Termination of the Franchise Agreement*.

18. Baskin-Robbins terminated the Franchise Agreement on June 27, 2023 due to the Franchisee's repeated and ongoing failure to pay Continuing Franchisee Fees and Continuing Advertising Fees as they came due. This termination followed an earlier Notice of Default, which afforded the Franchisee the opportunity to cure the outstanding financial defaults, but the Franchisee declined to do so. The June 27, 2023 Notice of Termination duly apprised the

Franchisee and Holocher of their post-termination obligations. A true and correct copy of the Notice of Termination is attached hereto as Exhibit B.

19.     On August 4, 2023, Baskin-Robbins sent a letter to the Franchisee and Holocher (the "August 4 Letter"), informing them that they had failed to pay the amounts due to Baskin-Robbins and noting that they had neither ceased operations at the Restaurant nor performed the work necessary to properly de-identify it. The August 4 Letter declared the Franchisee and Holocher to be in ongoing material breach of each Franchise Agreement. Neither the Franchisee nor Holocher took any action in response to the August 4, 2023 letter, and they continued to operate the Restaurant without authorization. A true and correct copy of the August 4 Letter is attached hereto as Exhibit C.

20.     On August 25, 2023, Baskin-Robbins, through its outside franchise counsel, sent another letter to the Franchisee and Holocher (the "August 25 Letter") addressing their ongoing material breaches of the Franchise Agreement and violations of the Lanham Act due to their continued operations of the Restaurant while making unauthorized use of the Proprietary Marks. The Franchisee and Holocher again took no action in response to the August 25 Letter, and they continued to operate the Restaurant without authorization. A true and correct copy of the August 25 Letter is attached hereto as Exhibit D.

21.     Additionally, upon further inspection of the Restaurant, Baskin-Robbins became aware that, not only are the Franchisee and Holocher continuing to operate the Restaurant and making continued, unauthorized use of the Proprietary Marks, they are now advertising for sale a competing brand of ice cream that ostensibly is sold through a network of retailers and distributors—Ashby's Sterling Ice Cream. A true and correct copy of photos of the Restaurant, with Baskin-Robbins trademarks on display, are discussed below and in Exhibit F.

22. On December 27, 2023, Baskin-Robbins, through its outside litigation counsel, sent a final letter to the Franchisee and Holocher (the "December 27 Letter"), addressing their ongoing failure to comply with the post-term obligations in the Franchise Agreement and newly discovered affiliation with Ashby's Sterling Ice Cream. A true and correct copy of the December 27 Letter is attached hereto as Exhibit E. The Franchisee and Holocher took no action in response to the December 27 Letter, and, to the best of the Baskin-Robbins Entities' understanding and belief, the Restaurant is still operating and making use of Baskin-Robbins' Proprietary Marks.

*Current State of the Restaurant*

23. I requested that a staff member at Baskin-Robbins' outside counsel's office visit the Restaurant to take photographs of the Restaurant and share them with me prior to submitting this Declaration. I have reviewed her declaration (*see* Declaration of Annie M. Fisher, attached hereto as Exhibit F) and am relying upon her sworn attestation as to the accuracy of the photographs. The following photographs attached to Ms. Fisher's declaration detail Baskin-Robbins branded items still present and in use at the Restaurant, alongside several instances of a competing ice-cream brand being advertised for sale at the Restaurant:

- Ex. F, Photo 1 – The exterior Baskin-Robbins channel lettering, with Ashby's Sterling signage in the window and the pink spoon—a federally registered trademark—still in use as a door handle.
- Ex. F, Photo 2 – A homemade sign referring to the owner of the Restaurant as "Blu Moo" and indicating that gift cards are not accepted. Baskin-Robbins franchisees are required to issue and accept Baskin-Robbins gift cards.
- Ex. F, Photo 3 – A Baskin-Robbins clock.
- Ex. F, Photo 4 – Baskin-Robbins wallpaper.

7

- Ex. F, Photo 5 – A Baskin-Robbins cone-display box.

- Ex. F, Photos 6, 7, and 8 – A Baskin-Robbins Polar Pizza, ice-cream cake, and individual cups in a cooler.

- Ex. F, Photo 9 – A Baskin-Robbins cup for serving milkshakes.

- Ex. F, Photo 10 – A Baskin-Robbins tasting spoon.

- Ex. F, Photos 11, 12, and 13 – Several Ashby's Sterling signs on the coolers containing the cartons of ice cream.

- Ex. F, Photo 14 – A large Ashby's Sterling display sign.

24. A list of Baskin-Robbins federally registered trademarks at issue here, based on photographs described above, is attached as Exhibit G.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 22, 2024

_____
Derek Ensminger